**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 14 CR 10 |
| | ) | |
| PRECIOUS W. HOUSE, et al. | ) | Judge Andrea R. Wood |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants Precious W. House, Brian K. Hughes, and Murchael O. Turner have been charged in a Superseding Indictment for their roles in a purported scheme to defraud credit unions by submitting fraudulent applications for automobile loans. In anticipation of the upcoming jury trial, the Government has filed two motions to admit evidence pursuant to Federal Rule of Evidence 404(b) (Dkt. Nos. 190, 231), and two proffers and motions to admit evidence at trial pursuant to *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978) and Federal Rule of Evidence 801(d)(2)(E). (Dkt. Nos. 191, 223.) Defendants did not file written responses to the Government's motions; nor did they oppose the motions at final pretrial hearing. The following represents the Court's rulings.

## BACKGROUND

On May 1, 2014, a Grand Jury returned a seven-count Superseding Indictment against Defendants House, Hughes, and Turner (collectively, "Defendants"), as well as two other co-defendants who have pleaded guilty. House is charged with six counts of bank fraud in violation of 18 U.S.C. § 1344, as well as one count of making false statements in a loan application in violation of 18 U.S.C. § 1014; Hughes is charged with three counts of bank fraud and one count of making false statements in a loan application; and Turner is charged with one count of bank fraud. The Superseding Indictment also contains a forfeiture allegation.

As set forth in the Superseding Indictment, Defendants are alleged to have participated in a scheme to defraud credit unions by submitting fraudulent applications for automobile loans. Specifically, the Superseding Indictment alleges that House controlled two wholesale car dealerships—Rolling Auto, Inc. and XPress Automotives, Inc.—that were licensed by the State of Indiana to sell vehicles to other dealerships. It further alleges that House worked with recruiters, including Hughes, Turner, and co-defendant Crystal Williams,[1] who sought out individuals looking for loans. Defendants agreed to find loans for these individuals in exchange for a fee of approximately 20 to 30 percent of the loan. Thereafter, according to the Superseding Indictment, Defendants knowingly submitted false information in loan applications, including false information about the applicants' income, employment, credit history, and intent to use the loan proceeds to purchase automobiles. The lenders typically issued checks payable to the loan applicant and to House or Rolling Auto. Hughes and House are alleged to have cashed certain of the checks at a currency exchange in Dolton, Illinois, and House is also alleged to have deposited certain of the checks into bank accounts that he controlled. The Superseding Indictment also alleges that House, Hughes, and Williams retained some of the loan proceeds and transferred other portions of the proceeds to themselves, other recruiters, or the loan applicants.

## DISCUSSION

## I.      Motions to Admit Rule 404(b) Evidence

Federal Rule of Evidence 404(b) prohibits the admission of evidence of other crimes, wrongs, or acts for the purpose of proving a person's character or propensity to behave in a certain way, but permits the use of such evidence for other purposes, including "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of

---

[1] Williams is charged with one count of bank fraud in the Superseding Indictment. She has pleaded guilty and the Government represents that she is expected to testify at trial.

accident." Fed. R. Evid. 404(b). The party seeking to introduce into evidence material covered by Rule 404(b) must be able to identify a "chain of reasoning that supports the non-propensity purpose for admitting the evidence." *United States v. Gomez*, 763 F.3d 845, 855 (7th Cir. 2014). In assessing whether evidence is admissible under Rule 404(b), "the district court should not just ask whether the proposed other-act evidence is relevant to a non-propensity purpose but how exactly the evidence is relevant to that purpose—or more specifically, how the evidence is relevant without relying on a propensity inference." *Id.* at 856. Furthermore, "even if other-act evidence is relevant without relying on a propensity inference, it may be excluded under Rule 403, which . . . gives the district court discretion to exclude relevant evidence if its probative value is 'substantially outweighed by a danger of . . . unfair prejudice.'" *Id.* at 856-57 (quoting Fed. R. Evid. 403).

The Government has filed two motions to admit evidence at trial pursuant to Rule 404(b). In the first Rule 404(b) motion, the Government seeks to introduce recorded conversations between Hughes and an undercover FBI agent ("UCO") that the Government contends establishes that Hughes was involved in fraudulently obtaining credit cards and non-auto loans on behalf of other individuals. (Dkt. No. 190.) In the second Rule 404(b) motion, the Government seeks to introduce evidence that House and Williams created fraudulent bank statements so that House could apply for loans for himself. (Dkt. No. 231.) The Court addresses each in turn.

A.     **Recordings Between Hughes and an FBI Agent**

The Government first seeks to introduce into evidence recordings of conversations between Hughes and the UCO regarding non-charged fraudulent credit schemes. At trial, to prove the conduct charged in Counts One and Three through Six against Hughes, the

Government plans to introduce evidence through multiple witnesses that Hughes instructed loan applicants to lie on loan applications and in phone conversations with loan officers about their income and employment. The Government contends that the conversations between the UCO and Hughes will help establish that Hughes, in addition to the mortgage fraud activities alleged in this case, also was involved with fraudulently obtaining credit cards and non-auto loans on behalf of other individuals. According to the Government, the recordings at issue establish that Hughes submitted applications for credit cards on behalf of the UCO; coached the UCO on how to provide answers to the type of questions that lenders commonly ask card applicants; informed the UCO that credit card companies would not need documentation of the applicant's income, but rather would rely upon the applicant's self-reported income in approving or denying the loans; provided the UCO with fraudulent information to supply to an American Express employee on a phone call; surreptitiously listened in on a call between the UCO and an American Express employee; and assisted the UCO with placing a series of additional phone calls to other financial institutions to check on credit card applications that Hughes had submitted on behalf of the UCO.

The Government argues that the evidence of Hughes's conversations with the UCO is admissible to show Hughes's knowledge, fraudulent intent, common plan, and absence of mistake in the instant case.[2] The Court agrees. Rule 404(b) specifically allows evidence of other bad acts to prove state of mind. Furthermore, the Court finds that this evidence is relevant without relying on a propensity inference. The evidence the Government proposes to introduce

---

[2] The Government also suggests that this evidence is relevant to show Hughes's motive. However, the Government fails to provide a detailed account of how this evidence would support this purpose, as required by the Seventh Circuit. *See Gomez*, 763 F.3d at 856 (proponent of material covered by 404(b) must provide detailed enumeration of the links along the inferential chain to show non-propensity purpose, as "[s]potting a hidden propensity inference is not always easy.").

would show that Hughes was aware that banks rely upon the self-reporting of loan applicants in assessing whether or not to extend a loan. Thus, this evidence would tend to prove that Hughes, in the actions he is alleged to have taken in this case, had the specific intent of defrauding banks and was not making harmless mistakes. *See Gomez,* 763 F.3d at 859 (when intent is at issue in the case, other-act evidence may be admissible to prove intent where it does not rely on a propensity inference and it satisfies Rule 403). The Court also finds that the relevance of this information is not substantially outweighed by its prejudicial effect. The Court will only allow introduction of this evidence in relation to Hughes's knowledge, fraudulent intent, plan, and absence of mistake, and will provide a limiting instruction to the jury to consider the evidence only for the issue of Hughes's state of mind (and not for propensity). *See id.* at 860 (acknowledging that "[a]ppropriate jury instructions may help to reduce the risk of unfair prejudice inherent in other-act evidence").

**B.     Evidence of House's Request that Williams Provide Him with Doctored Bank Statements**

The Government also seeks to introduce evidence, pursuant to Rule 404(b), that at some point prior to the charged scheme, House and Williams created fraudulent bank statements so that House could apply for loans for himself. The Government claims that as part of the charged scheme, House provided Williams with copies of Rolling Auto's bank statements from TCF Bank. Furthermore, the Government expects Williams to testify that House stated that he needed her help obtaining a loan and asked if she would inflate the balances on the statements. According to the Government, e-mails from February 17, 2013 will show that Williams sent House a collection of bank statements from August 31, 2012 through January 31, 2013, purportedly showing that Rolling Auto had massive cash deposits, including a balance of $164,908.12 on December 31, 2012 and $196,620.82 on January 31, 2013. In reality, as

demonstrated by true copies of the bank account statements obtained by the Government via subpoena, the statements show a balance of $0 on January 1, 2013 and only $253.18 on January 31, 2013.

The Government argues that evidence House and Williams created fraudulent bank statements on House's behalf will tend to prove House's knowledge that Williams was involved with preparing false documents for submission to lenders. According to the Government, this other-act evidence demonstrates that House knew Williams had the means and willingness to create fraudulent documents that would be submitted to lenders, thus defeating any claim by House that the scheme involved "misplaced trust" on his part, rather than fraudulent intent. In addition, the Government claims that this evidence is admissible to prove House's fraudulent intent because by asking Williams to create inflated bank statements for House's own loan applications House showed that he knew the lenders did, in fact, examine the material presented to them when deciding whether to approve loans. The Court agrees.

Knowledge and intent are both permissible purposes under Rule 404(b), and the evidence sought to be introduced by the Government is relevant without relying on a propensity inference. *See Gomez*, 763 F.3d at 856. Furthermore, as with the evidence regarding Hughes's conversation with the UCO, the Court finds that the relevance of this information is not substantially outweighed by its prejudicial effect. Also, the Court will provide a limiting instruction to the jury not to consider the evidence for propensity but, instead, to consider it only for House's knowledge and intent. *See id.* at 860.

## II.     The *Santiago* Proffers

The Government has also filed two proffers and motions to admit evidence at trial pursuant to *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978) and Federal Rule of

Evidence 801(d)(2)(E) ("*Santiago* Proffers"). The first describes testimony from Williams, loan applicants, and a currency exchange operator. (Dkt. No. 191.) The second relates to expected testimony from Williams that she conspired with Turner and House to submit a fraudulent loan application on behalf of Turner's mother. (Dkt. No. 223.)

The Government seeks to introduce this purported co-conspirator evidence under Rule 801(d)(2)(E), which provides that a statement is not hearsay if it "is offered against an opposing party" and is "a statement by a coconspirator of the party during the course and in furtherance of the conspiracy."[3] Rule 801(d)(2)(E) applies not only to conspiracies, but also to joint ventures. *United States v. Kelly*, 864 F.2d 569, 573 (7th Cir. 1989). Consequently, a formal conspiracy charge is not a prerequisite for the admission of statements under Rule 801(d)(2)(E), if the Government establishes that a "criminal venture existed and that the statements took place during and in furtherance of that scheme." *United States v. Reynolds*, 919 F.2d 435, 439 (7th Cir. 1990). Admission of such a statement is warranted where the Government establishes by a preponderance of the evidence that (1) a conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and (3) the statements sought to be admitted were made during and in furtherance of the conspiracy. *United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009).

Pursuant to *Santiago*, the Government has submitted pre-trial proffers regarding how it intends to satisfy these elements so that the Court may admit the co-conspirator evidence subject to a later determination during trial that the Government has in fact established the elements by a preponderance of the evidence. *See Santiago*, 582 F.2d at 1131; *see also United States v. Haynie*, 179 F.3d 1048, 1050 (7th Cir. 1999) (*Santiago* proffers allow a district court to "conditionally admit coconspirator statements based on the government's proffer"). At the close of its case at

---

[3] Based on the representations in the Government's motion and at the final pretrial conference, the Court understands that the Government intends to use Rule 801(d)(2)(E) as a means to introduce out-of-court statements by Defendants for use against their Defendant co-conspirators.

trial, if the Government "has not met its burden to show that the statements are admissible, the defendant can move for a mistrial or to have the statements stricken." *Haynie*, 179 F.3d at 1050. While the admissibility of conspirators' declarations "is not contingent on demonstrating by non-hearsay evidence either the conspiracy or a given defendant's participation," *United States v. Martinez de Ortiz*, 907 F.2d 629, 634 (7th Cir. 1990) (*en banc*), the contents of the proffered co-conspirator statements are not alone sufficient to establish the existence of a conspiracy and a defendant's participation in it. Fed. R. Evid. 801(d)(2)(E). In addition to the co-conspirator statements themselves, the Court must consider the circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement was made, and the evidence corroborating the contents of the statement. *United States v. Zambrana*, 841 F.2d 1320, 1344-45 (7th Cir. 1988).

### A.     The Proffered Evidence

First, the Government describes anticipated testimony from Williams. The Government contends that Williams will testify that she spoke with "recruiters" about the type of employment history, range of income, and credit scores that would make loan applicants appear attractive to lenders; and these recruiters then referred potential loan applicants to Williams, who used the Internet to find lenders. According to the Government, Williams will also testify that she instructed loan applicants via e-mails and phone conversations how to complete their loan applications, and that she further instructed the applicants to send the proceeds of the loans they obtained to House.

The Government also contends that Williams will testify that House told her that he did not have any vehicles at his dealership, but nonetheless provided her with information such as makes, models, VIN numbers, and mileage for Williams to input into purchase orders on Rolling

Auto stationery to make it appear as though the loan applicants were purchasing those vehicles from House's dealerships. The Government further expects Williams to testify that she and House calculated the amount of money that the applicants should receive from lenders after subtracting out fees for House, herself, and other recruiters. The Government claims that records will show that House then deposited those funds into various bank accounts. The evidence will also show that, in 2013, House told Williams that lenders would no longer issue loans for cars supposedly being sold by Rolling Auto, so Williams and House agreed to create XPress Automotives, Inc., a sham company that did not own or possess any cars for sale. Williams and House, using XPress Automotive, continued working together to obtain loans under fraudulent pretenses. The Government also claims that after agents interviewed Williams in the Fall of 2013, House warned Williams not to speak with law enforcement officers. Finally, Williams will testify that, with Turner's involvement, she helped submit a loan application on behalf of Turner's mother that fraudulently represented that Turner's mother was purchasing a vehicle from House and Rolling Auto.

 The Government also indicates it will adduce testimony from several loan applicants. For example, an individual known as MB will testify that Turner agreed to help MB obtain a car loan from Sherwin-Williams Credit Union. According to the Government, MB will testify that after he noticed that his loan application falsely stated that he worked for Turner's company, MB brought the false statements to Turner's attention. Turner, however, told him to leave it alone because the statements would make the loan go through easier. The Government further expects MB to testify that he received a check with proceeds of the fraudulently obtained loan, made payable to MB and Rolling Auto. Although House told MB that he would get a car within several days, the car never materialized. Nonetheless, House helped cash the check and kept

approximately 30 percent of the proceeds, claiming that the money was deducted for "re-stocking fees" and taxes.

The Government also indicates that it will put on testimony from loan applicants known as KB, WA, and WS establishing that Hughes instructed these applicants to lie about their income and employment on their loan applications. For example, the Government notes that it expects WS to testify that Hughes told him to falsely report to a credit union that he made over $62,000 per year. The Government also intends to call WA to testify that Hughes told him to list a false employer on his loan application and to introduce text messages and testimony from KB showing that Hughes coached her on what to say to loan officers during phone applications. During KB's phone conversations with loan officers, Hughes was secretly listening in and was sending text messages instructing her to lie and to answer the loan officer's questions in a particular way.

Finally, the Government proffers testimony from KB and the operator of a currency exchange in Dolton, Illinois. According to the Government, these individuals will testify about their experiences with House, Hughes, Foster, and other loan applicants when those individuals attempted to cash their fraudulently obtained checks. For example, the Government expects KB to testify that House participated in signing the checks and that Hughes helped to divide the proceeds. Meanwhile, the currency exchange operator will testify that House claimed he bought the luxury automobiles identified on the checks at good prices from Indiana auctioneers because they had low mileage.

### B.    Existence of and Membership in the Joint Venture

Based on the proffered evidence, the Government has demonstrated, by a preponderance of the evidence, that House, Hughes, Williams, and Turner entered into a joint venture to make

10

misrepresentations to various financial institutions, thereby fraudulently inducing them to release funds for purchases of automobiles. In particular, the evidence cited by the Government would establish that House used his dealerships to give the false impression that he was selling automobiles to the applicants when, in fact, he was not. This evidence would also indicate that Hughes, Turner, and Williams helped to recruit loan applicants and helped to prepare fraudulent loan applications. The evidence would also establish that Hughes also threatened the loan applicants in order to collect his exorbitant fees. Further, this evidence would show that House provided his co-defendants with certain information to help complete the fraudulent applications, cashed the fraudulently obtained checks, and controlled the distribution of the proceeds. In all, the proffered evidence is sufficient to establish by a preponderance of the evidence that House, Hughes, Williams, and Turner were engaged in a joint venture to defraud credit unions by submitting fraudulent applications for automobile loans. *See United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *United States v. Gil*, 604 F.2d 546, 549-50 (7th Cir. 1979).

The Government's proffer is also sufficient to establish that it is more likely than not that each of House, Hughes, Williams, and Turner intended to associate themselves with the joint venture and its criminal purpose. "To show that a defendant was involved in the conspiracy, the government must show that he '(1) knew of the conspiracy, and (2) intended to associate himself with the criminal scheme.'" *United States v. Stephenson*, 53 F.3d 836, 843 (7th Cir.1995) (quoting *United States v. Sullivan*, 903 F.2d 1093, 1098 (7th Cir. 1990)). "Once a conspiracy is established, only slight evidence is required to link a defendant to it." *United States v. Shoffner*, 826 F.2d 619, 6276 (7th Cir. 1987). The evidence proffered by the Government is sufficient to link each Defendant to the joint venture.

### C.      Statements in Furtherance of the Joint Venture

To be admissible pursuant to Rule 801(d)(2)(E), proffered conspirator statements must further the objectives of the conspiracy. Examples of ways in statements may further the objectives of a conspiracy include: (1) recruiting potential co-conspirators, (2) controlling damage to an ongoing conspiracy, (3) keeping co-conspirators advised of the progress of the conspiracy, (4) concealing the conspiracy, and (5) executing the conspiracy. *United States v. Bainbridge Mgmt., L.P.*, No. 01 CR 469-1, 2002 WL 31006135, at *3 (N.D. Ill. Sept. 5, 2002) (collecting cases). Given the broad range of conspirator statements that have been held to further the objectives of a conspiracy, the Government's *Santiago* Proffers in this case are sufficient to demonstrate that the out-of-court statements by Defendants about which the trial witnesses are expected to testify were made during and in furtherance of the conspiracy.

### CONCLUSION

For the reasons stated above, the Court grants the Government's Rule 404(b) motions. (Dkt. Nos. 190, 231.) The Court will allow into evidence recordings of conversations between the undercover FBI agent and Hughes regarding non-charged fraudulent credit schemes; as well as evidence of House and Williams creating fraudulent bank statements so House could apply for loans for himself. The Court also accepts the Government's *Santiago* Proffers and grants the motion to admit co-conspirator evidence. (Dkt. Nos. 191, 223.)

ENTERED:

Dated:  March 6, 2015

Andrea R. Wood
United States District Judge

12